BROWNSTEIN THOMAS, LLP
JOSH S. BROWNSTEIN SBN:  209760
MARK C. THOMAS SBN: 215580
180 Montgomery Street, Suite 940
San Francisco, CA 94104
Telephone: 415-986-1338
Facsimile:  415-986-1231

Attorneys for Petitioner
Fund Raising, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| In the Matter of the Arbitration between:<br><br>FUND RAISING, INC.,<br><br>　　　　　Petitioner,<br><br>vs.<br><br>ALASKANS FOR CLEAN WATER, INC.,<br>RENEWABLE RESOURCES COALITION,<br>INC., RENEWABLE RESOURCES<br>FOUNDATION, HACKNEY &<br>HACKNEY, INC., ARTHUR HACKNEY,<br>and ROBERT GILLAM.<br><br>　　　　　Respondents. | CASE NO.: CV 09-04106 AHM (VBKx)<br><br>**FUND RAISING, INC.'S FIRST AMENDED PETITION TO COMPEL ARBITRATION**<br><br>**(9 U.S.C. § 4)** |

The petition of Fund Raising, Inc. respectfully shows:

### JURISDICTION AND VENUE

　　　　1.　　This is a petition to compel arbitration under the Federal Arbitration Act (9 U.S.C. § 4).  This Court has jurisdiction over this petition, because in the absence of the written agreement to arbitrate, this Court would have diversity jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity between the parties and the amount in controversy in the underlying dispute exceeds $75,000.00.

2.      Venue is proper in this district because the parties' written agreement to arbitrate specifies that the arbitration shall take place in Los Angeles, California.

## PARTIES

3.      At all relevant times, Petitioner Fund Raising, Inc. ("FRI") is a corporation organized and existing under California law with its principal place of business in California. Respondent Alaskans for Clean Water, Inc. ("AFCW") is a corporation organized and existing under Alaska law with its principal place of business in Alaska.  Respondent Hackney & Hackney, Inc. (Hackney & Hackney) is a corporation organized and existing under Alaska law with its principal place of business in Alaska.  Respondent Arthur Hackney ("Hackney") is an individual residing in Alaska and a citizen of the state of Alaska.  Respondent Robert Gillam ("Gillam") is an individual residing in Alaska and a citizen of the state of Alaska. (ACFW, Hackney & Hackney, Hackney, and Gillam are collectively referred to as "Respondents").

4.      Renewable Resources Coalition, Inc. (hereinafter "RRC") is a corporation organized and existing under Alaskan law.  RRC was dismissed because it agreed to arbitrate this dispute.

5.      Renewable Resources Foundation (hereinafter "RRF") is a corporation organized and existing under Alaskan law.  RRF was dismissed because it agreed to arbitrate this dispute.

## GENERAL ALLEGATIONS

6.      On or around April 1, 2009, Respondents retained petitioner "to perform general fundraising consulting services for [Respondents], which may, but are not required to, include, without limitation, advising or working with [Respondents] to develop fundraising strategy, messages and themes, drafting fundraising letters, soliciting potential contributors, and organizing and training fundraising committees and individuals to solicit funds on behalf of [Respondents], and consulting with [Respondents] with respect to its activities.  [Petitioner] explicitly makes no representations, promises, guarantees or warranties relating to how much money will be raised or success or outcome for [Respondents]."  (A true and correct copy of the contract is attached hereto as Exhibit 1 and incorporated herein by reference.).

7.      The contract for Petitioner's services contained the following arbitration clause:

> **Section 6.06** - <u>Arbitration</u>. Any dispute which arises in connection with this Agreement or any claim or claims referring or relating to its performance or breach, or any other claim or dispute between the Parties hereto, including, but not limited to, any controversy over any clause, provision, paragraph or word, shall be submitted by the Parties to the American Arbitration Association or JAMS in Los Angeles, California for binding arbitration in the City of Los Angeles, with the Parties' choice of law acknowledged and agreed to be the law of the State of California. Choice of American Arbitration Association or JAMS shall be at the sole and absolute discretion of Contractor. The Parties expressly agree that all of the discovery mechanisms provided by California law, including depositions and third party discovery, shall apply and be available to the parties. If the Party obligated to pay an award fails to pay said award within thirty (30) days of the award, the amount of the award shall be doubled, and this provision shall be part of the award itself. If any filing is made to avoid arbitration or an arbitration award, any award against the filing party shall be doubled. Judgment upon an award made in such binding arbitration may be entered and enforced in any court of competent jurisdiction. The prevailing party in any such arbitration or judicial proceeding shall be entitled to recover all costs and expenses incurred, including reasonable attorneys' fees, such amounts to be part of the award itself.

8.      Disputes have arisen between Petitioner and Respondents concerning the Contract. Pursuant to the arbitration agreement, on May 20, 2009 Petitioner submitted its First Amended Demand for Arbitration to JAMS. (A true and correct copy of Petitioner's First Amended Demand for Arbitration is attached hereto as Exhibit 2).

9.      On June 3, 2009, Petitioner was advised by JAMS's general counsel that the arbitration would proceed against only two (2) of the named Respondents: Renewable Resources Coalition, Inc. and Alaskans for Clean Water, Inc. (A true and correct copy of the e-mail from JAMS is attached as Exhibit 3). JAMS's general counsel did not provide any justification for not allowing the arbitration to proceed against Respondent RRF, Hackney & Hackney, Hackney, or Gillam.

10.     AFCW, Hackney and H&H are parties to the arbitration agreement because the Contract states they are parties.

11.     Gillam is bound by the arbitration agreement because he is the alter ego of AFCW, RRC, and RRF. There exists, and at all times mentioned has existed, a unity of interest

between Gillam, on the one hand, and AFCW, RRC and RRF, on the other, such that any

individuality and separateness between the parties has ceased. FRI is informed and believes, and

thereon alleges that: (1) Gillam has completely controlled, dominated, managed and operated

AFCW, RRC, and RRF for his sole and exclusive benefit; (2) Gillam commingled his assets with

the corporations to suit his needs and convenience; and (3) Gillam has failed to maintain any

degree of separateness with ACFW, RRC and RRF, and failed to observe corporate formalities.

12.     At all material times ACFW, RRC and RRF were completely controlled

and dominated by Gillam. ACFW, RRC and RRF were corporate shells of Gillam, and nothing

more. Gillam had and maintained control over every aspect of the AFCW, RRC and RRF.

Gillam contributed 89% of the 2.9 million dollars collected by the AFCW, and through Hackney,

controlled the expenditures with no oversight from the AFCW board members or staff.

13.     In addition to his contributions, Gillam personally paid for AFCW's

expenses, including invoices for FRI's services, and magazine advertisements. Gillam also

personally negotiated Petitioner's contract.

14.     Gillam, Hackney, H&H, and others were investigated by the Alaska

Public Offices Commission ("APOC") for violations of Alaskan campaign finance laws. APOC

found that the staff and directors of the AFCW, RRC, and RRF were so intertwined, "corporate

boundaries were blurred, crossed and ignored."

15.     The failure to disregard the corporate entity would sanction a fraud or

promote injustice because Gillam formed the RRC, RRF and AFCW to violate Alaska campaign

disclosure law. Gillam used the RRC, RRF and AFCW to make illegal, anonymous

contributions in violation of Alaska campaign disclosure law. RRC was specifically set up with

the idea that it could be used to veil contributions. Gillam used RRC as a pass through to veil

Gillam's contributions to AFCW in violation of Alaska law.

16.     Respondents' violations of Alaska campaign disclosure law were in

derogation of FRI's interests. FRI was engaged to raise funds for AFCW, RRC and RRF.

Respondents, however, refused to cooperate with FRI's efforts to raise funds because Gillam

used the corporations to veil his contributions, thus, limiting the need to raise additional funds. FRI was retained only as a front to cover Gillam's violations of Alaska campaign disclosure law.

17.    Without Gillam's financial support, AFCW, RRC and RRF have insufficient assets to respond to the an award of compensatory damages, costs, attorneys' fees and punitive damages sought in this case.

18.    FRI believes and thereon alleges that Gillam has committed additional acts and omissions sufficient to impose alter ego liability of which FRI is presently unaware. Additional acts and omissions on the part of Gillam, consistent with those factors listed in *Associated Vendors, Inc. v. Oakland Meat Co.*, (1962) 210 Cal.App.2d 825, 838-840, and subsequent cases, will be developed during discovery in this litigation.

///

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully prays for relief as follows:

1.    For an order directing the arbitration to proceed in the manner provided for in the arbitration agreement;

2.    For an award of attorneys' fees, and costs against any party opposing this petition to compel arbitration, as authorized under the terms of the Contract;

3.    For such other and further relief as the Court may deem proper.

///

BROWNSTEIN THOMAS, LLP

DATED: November 9, 2009

MARK C. THOMAS
Attorney for Fund Raising, Inc.

# EXHIBIT 1

## CONSULTING AGREEMENT

This Consulting Agreement (hereinafter "Agreement") is made and entered into between **Fund Raising, Inc.**, a California Corporation, located at 12021 Wilshire Blvd., #542, Los Angeles, California 90025 (hereinafter "Contractor"), and **Art Hackney, Hackney & Hackney, Inc. (Alaska Entity #88598D), Alaskans For Clean Water, Inc. (Alaska Entity #114856); Renewable Resources Coalition, Inc. (Alaska Entity #95608); and Renewable Resources Foundation, Inc. (Alaska Entity #99660),** and/or any and all successor or related entities, currently located at the offices of Hackney & Hackney, Inc., 1503 W. 31st Avenue, Anchorage, Alaska 99503, (hereinafter all collectively referred to as "Client"). Contractor and Client are sometimes collectively referred to hereafter as the "Parties" or individually as "Party."

### RECITALS

A.      Client desires to raise money for various election, public education, lobbying or other efforts in opposition to the "Pebble Mine" project in Alaska;

B.      Client desires to engage Contractor to perform general fundraising and related consulting services for Client effort in opposition to the "Pebble Mine" project in Alaska;

C.      Accordingly, Client and Contractor desire to enter into this Agreement to evidence the engagement of Contractor by Client;

NOW, THEREFORE, in consideration of the promises and other consideration stated herein, the Parties hereto agree as follows:

### ARTICLE 1
### TERM OF CONTRACT

**Section 1.01 - Term.** This Agreement shall be effective as of April 1, 2008 and shall continue in effect for a period not to exceed five years from execution date of Agreement (the "Term"). Notwithstanding anything to the contrary contained herein, the Term of this Agreement may be terminated by Client pursuant to Section 1.02 below.

**Section 1.02 - Termination.** At any time after one year from the commencement of the Term, Client shall have the right to terminate this Agreement only for cause by giving Contractor at least sixty (60) days written notice (the "Termination for Cause Notice") prior to the effective date of such termination. For purposes hereof, "for cause" shall mean Contractor's failure to perform a majority of its duties as provided elsewhere in this Agreement after Client has notified Contractor in writing of the specific reasons Contractor is not fulfilling its duties hereunder, outlines in writing specific steps to correct any such problems, provides complete cooperation to Contractor in its efforts to perform, and contractor has failed to cure such default within sixty (60) days after receipt of such written notice. Client recognizes that by entering into this Agreement, Contractor is foregoing the opportunity to solicit and accept other business, and that nature of Contractor's business would make it difficult for the Contractor to acquire other business if this Agreement is terminated. If Client does elect to terminate Contractor for cause, as defined herein, then Client agrees to pay Contractor all remaining expenses and Continuing Base Compensation, as defined in Section 3.01, due and specifically payable on the effective date of termination. All other payments due pursuant to Article 3, Compensation, are due and specifically payable on the effective date of Termination or when such contribution is received by Client. Such payments shall include, but are not limited to, all Contractors' Continuing Base Compensation, Commissions, and expense reimbursements accrued or incurred in connection with work in progress. Client agrees to pay Contractor commissions on all contributions solicited by Contractor, or caused to be solicited by Contractor directly or indirectly when received by Client, even if the Client receives such contributions after the effective date of any termination or after the expiration of the Term hereof for a period of twelve months. Nothwithstanding anything to the contrary contained herein, in the event any

discrete Client which is a Party to this Agreement deems by a majority vote of said Client's Board of
Directors to wind-down and formally dissolve, following all federal, state and local laws relating to such a
wind-down, fully satisfies its financial and contractual obligations for payment to Contractor, and such
Party does formally and legally dissolve, so long as all obligations to Contractor are satisfied, and such
Client does not reconstitute itself with substantially the same purpose, staff and donors in another form or
fashion to fulfill the same or similar role as said Client as a means and/or method to all, or in part, avoid
its obligations to Contractor, then said Client may be able to terminate this Agreement without Cause
upon sixty days (60) notice to Contractor.

## ARTICLE 2
## SERVICES TO BE PERFORMED BY CONTRACTOR

**Section 2.01** - Duties. Client hereby agrees and retains the services of Contractor to perform
general fundraising consulting services for Client, which may, but are not required to, include, without
limitation, advising or working with Client to develop fundraising strategy, messages and themes,
drafting fundraising letters, soliciting potential contributors, and organizing and training fundraising
committees and individuals to solicit funds on behalf of Client, and consulting with Client with respect to
its activities. Contractor explicitly makes no representations, promises, guarantees or warranties relating
to how much money will be raised or success or outcome for Client.

    A.    Contractor shall not be responsible for the day-to-day implementation of
the fundraising plan and/or activities. Essential to this Agreement and its execution is Client's agreement
to make available to Contractor one or more staff persons to implement the day-to-day fundraising plan,
as instructed by Contractor. Contractor expects that activities of Client staff so assigned will include, but
not be limited to, following direction of Contractor in the implementation of the fundraising plan,
soliciting support and contributions of targeted individuals and groups, soliciting participation of
prospective donors or contributors with Finance Committees, following up with prospective donors or
contributors, organizing and managing fundraising events, researching prospective donors, soliciting
prospective donors, working with Finance Chair and Finance Committees, producing call lists, and other
activities as may be necessary to successfully implement the fundraising plan.

**Section 2.02** - Method of Performance. Contractor will, in its sole discretion, determine the
method, details, and means of performing the above described services subject to the advice and consent
of the Client and the provisions of this Agreement.

**Section 2.03** - Additional Staff. Contractor may use its own staff to perform the services required
under this Agreement; such staff shall work under the supervision of Contractor.

**Section 2.04** - Independent Contractor. Contractor shall perform the services under this
Agreement as an independent contractor and Client agrees Contractor shall not be treated as an employee
of Client for federal, state, or local tax purposes, or any other purposes.

**Section 2.05** - Exclusive Services  During the Term of this Agreement, Client shall not retain the
services of any other fundraiser for compensation, directly or indirectly, without the prior written consent
of Contractor. Any other fundraisers hired or otherwise engaged for the benefit of Client shall work
under the direction of Contractor, unless otherwise agreed to in writing by Contractor. Any fees,
commissions or other payments paid to such persons will be in addition to the Base Compensation and
Commissions due Contractor under the terms of this Agreement.

    a.    Notwithstanding anything to the contrary contained herein, Contractor is aware that
an agreement exists between Client and Bill Cromer individually for him to perform very specific, limited
and targeted fundraising, to be performed by him personally and not by his agents, assigns or employees,
said activities further addressed in Section 3.01 (3) and in Exhibit A, incorporated herein by this
reference.

**Section 2.06** - Contractor Acting as Agent for the Procurement of Goods or Services. It is agreed and understood by Client that Contractor may act as the agent of Client in connection with the procurement or purchase of vendors' goods or services benefiting the Client. The term "vendor" is defined to mean any person or entity providing goods or services for compensation and for the benefit of the Client, other than Contractor. In the event such goods or services are procured or purchased by Contractor, vendor invoices shall be submitted by Contractor directly to Client for a direct payment by Client to the vendor. Notwithstanding the fact that Contractor has no duty to pay for vendor goods or services, if Contractor does so to protect its credit or for any other reason, Client agrees to indemnify Contractor and hold Contractor harmless, through reimbursement or otherwise, from any amounts Contractor becomes obligated to pay or elects to pay in connection with vendor goods or services. Contractor shall not incur any individual expense greater than $2,500 without prior knowledge of Client until such time as there is exists an agreed upon budget for all expenses.

## ARTICLE 3
## COMPENSATION

**Section 3.01** - Base Compensation and Continuing Base Compensation. In consideration for services to be performed by Contractor, Client agrees to pay Contractor non-refundable base compensation ("Base Compensation") of Sixty-Eight Thousand Seven-Hundred Fifty ($68,750), deemed fully earned and payable upon execution of this Agreement, for the period of April 1, 2008 through August 31, 2008. Notwithstanding anything to the contrary contained herein, Contractor agrees to allow Client to pay Base Compensation as follows: $30,000 upon execution of Agreement; $30,000 on May 15, 2008; and $8,750 on July 1, 2008. For the period after September 15, 2008 through the termination of Contractors services, Base Compensation shall become ("Continuing Base Compensation") of One-Hundred Twenty-Thousand Dollars ($120,000) per every 12 month period, starting September 1, 2008. Such Continuing Base Compensation during this period shall to be paid in monthly installments of Ten-Thousand Dollars ($10,000), due and payable on the first day of each month. In the event of early termination for cause as described in Paragraph 1.02, Continuing Base Compensation shall be paid on a pro-rata basis. All Base Compensation and Continuing Base Compensation shall be paid without deduction for social security, federal or state taxes, or any other charges, offsets or deductions

**Section 3.02** - Commissions.

1. In addition to the Base Compensation payable pursuant to Section 3.01, the Client agrees to also pay Contractor commissions on the following schedule during the period April 1, 2008 through September 15, 2008:

a. Fifteen Percent (15 %) of any and all aggregate contributions, as defined herein in Section 3.02, received directly or indirectly by Client up to Two Million Five-Hundred Thousand Dollars ($2,500,000).

b. Twenty percent (20%) of any and all aggregate contributions, as defined herein in Section 3.02, received directly or indirectly by Client, without limitation, in excess of Two Million Five-Hundred Thousand Dollars ($2,500,000).

2. In addition to the Continuing Base Compensation payable pursuant to Section 3.01, Client agrees to also pay Contractor commissions on the following schedule during the period after September 15, 2008:

a. Fifteen Percent (15%) of any and all aggregate contributions, as defined in Section 3.02, received directly or indirectly by Client up to Five Million Dollars ($5,000,000) during each twelve month period, starting September 15, 2008.

b. Twenty percent (20%) of any and all aggregate contributions, as defined in Section 3.02, received directly or indirectly by Client, without limitation, in excess of Five Million Dollars ($5,000,000) for any twelve month period starting after September 15, 2008.

3. Notwithstanding anything to the contrary contained herein, contributions received by Client directly and personally from Robert Gillam or the Moore Foundation shall remain excluded from commissions. On a one-time basis only, all contributions received from the May 4th Trout Unlimited event in New York City shall also be excluded from commissions. As discussed in Section 2.05 (a),

contributions limited to those personally solicited, collected and delivered to Client by Bill Cromer only, and limited to only those names listed on Attachment A, incorporated herein by this reference, shall be excluded from Contractor commissions for a period of forty five days (45) from execution of this Agreement ("Cromer Exclusionary Period"). At the end of the Cromer Exclusionary Period, all contributions from names and entities on Attachment A shall be deemed fully commissionable to Contractor.

    4.    For the purposes of this Agreement, "Contributions" shall mean one hundred percent (100%) of the total amount of monetary and non-monetary contributions actually received by Client, either directly or indirectly, from any source, regardless of whether that contribution or pledge was solicited directly by Contractor, caused to be solicited by Contractor, or solicited by anyone else for any reason, from and after the effective date, even if such contributions are received by the Client after the termination or expiration of the Term hereof for a period of twelve months, regardless of termination or expiration. Additionally, for the purposes of this Agreement, "Contributions" shall mean, in addition to any monetary contribution made directly to Client, any contributions made by any person or entity to or that are; i) given directly to Client or any subsequent entity it becomes; ii) given to another entity, which makes a contribution to Client; iii) made as a payment by any person or entity to another entity or person to satisfy obligations of Client; iv) made as a payment by any person or entity to another entity or person to undertake any expenditures on behalf of Client or issue on which Client is based; or, v) made by any person or entity to aid or support Client. Contributions will be deemed received upon the date of receipt, regardless of when deposited by Client. All commissions due under this Agreement shall be calculated on a weekly basis, based on the date of receipt in the prior seven day period, according to the terms herein. Client agrees to pay Contractor commissions on Friday of each week for the prior seven day period.

    **Section 3.03- Expenses.** Client agrees to reimburse Contractor within seven (7) days of submission of all expense reimbursement requests, when such requests become due and payable, for all amounts incurred by Contractor in connection with performance of its duties. Expenses include, but are not limited to, airfare, car rental, hotel, postage, printing, relevant wireless and land-line telephone, facsimile, copies, data entry and database creation. If any dispute arises as to any invoice for expense incurred by Contractor in connection with the performance of its duties under this Agreement, Client shall pay the undisputed amount according to terms described herein, and may withhold the disputed amount for a period not to exceed two weeks pending review and resolution with Contractor. After resolution of any disputed invoice for expenses, Client shall make immediate full payment of any or all remaining undisputed amount within three (3) days. Client agrees to pay Contractor an expense deposit of Two Thousand Five-Hundred Dollars ($2,500) at the start of the Term to be held by Contractor until the end of the Term, and used by Contractor as an off-set against any outstanding expenses and/or commissions due to Contractor at the end of the Term. Any remaining balances will be returned to Client. Contractor shall not incur any individual expense greater than Two-Thousand Five-Hundred Dollars ($2,500) without prior knowledge of Client.

    **Section 3.04 - Delinquent Payments.** Client hereby agrees that if for any reason it does not pay any fees, commissions or other monies due to Contractor or does not reimburse Contractor for its expenses within five (5) days of when they become due, any delinquent amounts shall accrue interest at the lesser of the following rates: (I) ten percent (10%) interest per annum; or (ii) the maximum rate allowed by law, until such time as such amounts are paid or reimbursed in full.

    **Section 3.05 - Work Stoppage.** If Client fails to make any payments due to Contractor pursuant to this Agreement when due, Contractor may, in its sole and absolute discretion, immediately cease performing its duties as stated in this Agreement. Additionally, if Client fails to make any payments due to Contractor pursuant to this Agreement when due, Contractor may instruct, upon two days written notice to Client, all of Contractor's employees or agents to cease performing any services which they are

performing directly or indirectly for Client unless such amounts are paid in full within this two day period. Contractor reserves the right to seek a temporary restraining order and/or preliminary injunction and/or other similar equitable relief in any court of competent jurisdiction for the purpose of freezing Client accounts in the event of non-payment, until such payment is made. This right to seek equitable relief is limited to the stated purpose, and all other disputes, proceedings and controversies shall be subject to the provisions of Section 6.05 below. Contractor and his employees and agents shall not be liable for any damages to Client, its affiliates, officers, directors, candidates, representatives, agents, employees or any other person, caused by the cessation of the work by Contractor, his agents or employees, pursuant to the terms of this Section 3.05. Client shall remain liable for all fees and commissions due hereunder, and any direct and indirect damages caused by Client in failing to fulfill its obligations hereunder. Client agrees that it shall not be allowed to terminate this Agreement if Contractor exercises its rights pursuant to this Section. Additionally, Client agrees not to hire or otherwise engage the services of any other fundraiser during two day notice period or such work stoppage period.

 **Section 3.06** - Assurance of Performance. Client agrees that it will pay Contractor all fees, commissions and expenses when due. Client warrants that it will not use Contractor's fees and commissions to pay any expenses, fees, commissions of other consultants or employees of Client, or to purchase television, cable television or radio airtime, produce or pay for postage of mailers, or for any other purpose other than payment to Contractor. Client agrees that any diversion of Contractor funds shall be considered a bad faith action.

## ARTICLE 4
## OBLIGATIONS OF CONTRACTOR

 **Section 4.01** - Confidentiality. Contractor shall, with respect to any information designated by Client or its member organizations as confidential, hold such information in confidence and use same only in connection with the services provided hereunder.

 **Section 4.02** - Liability. Client agrees that Contractor shall not be liable or held liable to Client, or to any party who may claim any right due to a relationship with Client, for any act or omission in the performance of Contractor's services under the Terms of this Agreement unless such act or omission is held by a Trier of fact to be due to the willful misconduct or gross negligence of Contractor. Client agrees to indemnify and hold Contractor harmless from any obligations, costs, claims, judgments, attorneys' fees, and attachments imposed on or incurred by Contractor arising from, growing out of or in any way relating to the services rendered to or on behalf of the Client under the terms of the Agreement. Such indemnification obligation by Client shall also include the costs incurred by Contractor to defend such action, as such costs are incurred. Client agrees that Contractor shall have no liability for any obligations, lawsuits, claims, actions or judgments imposed upon Client by any individual, entity or governmental entity.

 **Section 4.03** - Compliance with Laws. In its performance under this Agreement, Contractor shall make all reasonable efforts to comply with laws pertaining to Client contributions; provided, however, Client acknowledges that it has and shall have full responsibility and the duty to comply with all laws pertaining to reporting contributions and to file all documents required of it with all government and regulatory authorities. Additionally, Client agrees to make its attorney available to Contractor if Contractor has any questions regarding reporting or other requirements relating hereto. Client agrees that Contractor shall have no responsibility whatsoever for reporting any contributions on the behalf of Client.

## ARTICLE 5
## OBLIGATIONS OF CLIENT

 **Section 5.01** - Cooperation. Client agrees to cooperate fully with and be responsive to all reasonable requests of Contractor necessary to the performance of Contractor's duties under this Agreement. Client agrees to use its best and good faith efforts to make its principals and leadership

available to Contractor to perform and/or participate in the following activities and actions upon request of Contractor: (i) initiate fundraising related telephone calls and participate in fundraising activities as requested by Contractor; (ii) attend meetings and participate in fundraising, finance and other committee activities; (iii) participate in the timely review and execution of letters and other materials; (iv) review and approve fundraising plans; (v) solicit participation and help of Client leadership and the leadership of supporting organizations; (vi) provide Contractor with direct access to Client leadership; (vii) provide Contractor with appropriate budget to effectively executes its obligations under the Terms of this Agreement; and (viii) provide Contractor with timely information on Client's activities. Client shall also make available to Contractor its entire contact and related lists, and other materials and resources as may be needed to perform Contractor's duties.

**Section 5.02** - Confidentiality. Client shall, with respect to terms of Article 3 of this Agreement, hold said terms in strict confidence. Client understands that its failure, or the failure of its leadership, employees, contractors and agents, to maintain confidentiality of compensation or commissions due Contractor under this Agreement may materially affect contributions to Client and Contractor's commissions. However, if Client is required to disclose Contractor's compensation to a potential donor as condition of receiving donor's contribution, only after receiving explicit written permission from Contractor, Client may disclose in confidence the terms of Article 3 only to the extent needed. If the Client is required to report Contractor's compensation and commissions to a government reporting agency, Client may disclose such information to a government agency only. Failure to maintain confidentiality, except as allowed by the preceding sentence, will be acknowledged by as a material breach of this Agreement and Client agrees to be held liable for any loss of commissions from contributions that would have been received by Client had the terms of Article 3 been held in confidence.

**Section 5.03** - Assignments. Neither this Agreement nor any duties or obligations of Client under this Agreement may be assigned by Client without the prior written consent of Contractor.

**Section 5.04** - Compliance with Laws. Client warrants and covenants that it has and will fully comply with all laws pertaining to Client contribution reporting. Client agrees to indemnify and hold Contractor harmless from any liability with respect thereto as provided in this Agreement. Client shall provide copy of fund raising reports filed with government agencies to Contractor within fifteen (15) days after request therefore by Contractor.

**Section 5.05** - Indemnification. Client agrees to indemnify and defend Contractor, its employees, officers, directors, shareholders and agents (hereinafter collectively "Contractor Indemnitees"), for all expenses, fines, damages, costs, penalties, liability and amounts incurred in judgments or settlements, including attorneys' fees, suffered by Contractor Indemnitees, or any of them, as a result of threatened, pending or completed investigations, enforcement actions, claims, demands or any and all lawsuits against Contractor Indemnitees or any of them by a third party or parties, arising out of the activities or services of Contractor Indemnitees to, or on the behalf of, Client, provided that Contractor Indemnitees have not been held by a Trier of fact to have engaged in willful misconduct or gross negligence which causes, in whole or in part, the amounts claimed for indemnification. Client agrees to advance, within seven (7) days of a written request by Contractor, such legal fees, retainers and costs, as incurred or as maybe required to retain legal counsel of Contractors choosing, to defend against any such actions or seek advice or counsel relative to any threatened actions. Client also agrees to indemnify and hold Contractor Indemnitees, and each of them, harmless from any and all liability arising from or related to any requirements imposed on Client by any Client reporting and practices laws, which arise from any act or omission, including the negligence of Client, its employees and/or agents, provided that Contractor Indemnitees have not been held by a Trier of fact to have engaged in willful misconduct or gross negligence by act or omission., or act which causes, in whole or in part, the amounts claimed for indemnification.

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.01** - Notices. Any notices to be given hereunder by either party to the other may be effected by either party in writing via certified mail.

**Section 6.02** – Assignment.. Contractor has right and authority to assign this Agreement to another entity of its choosing, so long as Contractor's commitment to Agreement remains the same.

**Section 6.03** - Entire Agreement. This Agreement constitutes the final, complete, and exclusive statement of the terms of the Agreement between the Parties and supersedes all prior and contemporaneous understandings or agreements of the Parties. Contractor is entering into this Agreement based on the previous representations by Art Hackney and/or Hackney & Hackney, Inc. that Boards of Directors of Clients have authorized Art Hackney to enter into this Agreement on their behalf. No party has been induced to enter into this Agreement by, nor is any party relying on, any representation or warranty outside those expressly set forth in this Agreement.

**Section 6.04** – No Oral Modification. This Agreement may be supplemented, amended or modified only by the mutual written agreement of the Parties. No supplement, amendment, or modification of this Agreement shall be binding unless it is in a writing executed by both Parties.

**Section 6.05** - Severability of Agreement. If either a court or an arbitrator of competent jurisdiction holds any provision of this Agreement to be illegal, unenforceable, or invalid in whole or in part for any reason, the validity and enforceability of the remaining provisions, or portions of them, will not be affected.

**Section 6.06** - Arbitration. Any dispute which arises in connection with this Agreement or any claim or claims referring or relating to its performance or breach, or any other claim or dispute between the Parties hereto, including, but not limited to, any controversy over any clause, provision, paragraph or word, shall be submitted by the Parties to the American Arbitration Association or JAMS in Los Angeles, California for binding arbitration in the City of Los Angeles, with the Parties' choice of law acknowledged and agreed to be the law of the State of California. Choice of American Arbitration Association or JAMS shall be at the sole and absolute discretion of Contractor. The Parties expressly agree that all of the discovery mechanisms provided by California law, including depositions and third party discovery, shall apply and be available to the parties. If the Party obligated to pay an award fails to pay said award within thirty (30) days of the award, the amount of the award shall be doubled, and this provision shall be part of the award itself. If any filing is made to avoid arbitration or an arbitration award, any award against the filing party shall be doubled. Judgment upon an award made in such binding arbitration may be entered and enforced in any court of competent jurisdiction. The prevailing party in any such arbitration or judicial proceeding shall be entitled to recover all costs and expenses incurred, including reasonable attorneys' fees, such amounts to be part of the award itself.

**Section 6.07** - Attorneys' fees. If any proceedings are initiated to enforce or interpret the provisions of this Agreement, or to resolve any other dispute or controversy between the Parties, including arbitration, the prevailing party will be entitled to reasonable attorneys' fees incurred in addition to costs, expenses and any other relief to which the party may be entitled. If a party hereto has an award entered against it in arbitration, and said party: (i) opposes a petition to confirm the award as a judgment; (ii) opposes enforcement of any judgment in a court of competent jurisdiction, including any sister state court; (iii) files any other form of litigation or proceeding intended to obstruct or interfere with the arbitration process provided by this Agreement; or (iv) undertakes any other step or action to prevent arbitration or prevent enforcement of an arbitration award or a judgment, then the prevailing party in any such proceedings shall also be entitled to its reasonable attorneys' fees, costs and expenses as well as any other relief to which it may be entitled.

**Section 6.08** – Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

**Section 6.09** - <u>Authorization to Sign</u>. All Parties and the individual entity Clients hereby represent and warrant that the person(s) executing this Agreement are authorized to execute this Agreement and to obligate the respective Parties to perform the Agreement.

**Section 6.10** - <u>Interpretation of Agreement</u>. Client acknowledges that the Agreement has been jointly drafted by the Parties and that they have reviewed and revised the Agreement, or have had the opportunity to revise the Agreement and review the Agreement with their attorneys; accordingly any ambiguity contained herein shall not be construed for or against any Party.

**Section 6.11** - <u>Gender.</u> References to any gender in this Agreement shall include all other genders; references to the singular shall include the plural; and references to "person" shall include corporation, firm, partnership or other form of association; all as required by the context of this Agreement.

**Section 6.12** – <u>Corporation</u>. Client acknowledges that this Agreement is between Client and Contractor, a registered, valid and current California corporation in good standing.

Agreed and Accepted, and executed by the Parties to be effective April 1, 2008:

**RENEWABLE RESOURCES COALITION**

By: _____
Art Hackney
A Board Authorized Signatory

Date: ____4/4/08____

**ALASKA CLEAN WATER**

By: _____
Art Hackney
A Board Authorized Signatory

Date: ____4/1/08____

**FUND RAISING, INC.**

By: _____
Robert Kaplan
Its:    President

Date: ____3/31/08____

**RENEWABLE RESOURCES FOUNDATION**

By: _____
Art Hackney
A Board Authorized Signatory

Date: ____4-4-08____

# ADDENDUM

This addendum relates to that certain Agreement dated April 1, 2008 between Contractor and Client is hereby amended according to the following terms:

1. Contributions received directly from Richard Jameson, Ashley Reed, Art Hackney, John Holman, Luki Akelkok, Jack Hobson or employees and board members of Client shall be exempt from commissions.

2. Contributions solicited directly by Robert Gillam shall be exempt from commissions.

3. Renewable Resources Coalition, Inc. and Renewable Resources Foundation, Inc. has previously compiled a membership list of prior donors (listed in attached Exhibit A). Donations from such members shall be exempt from commission in an amount equal to twice the amount of such donors' largest prior annual contribution.

4. Employees of Renewable Resources Coalition, Inc. and Renewable Resources Foundation, Inc. may continue to sign up new member donors. Any such member donor's contributions to Renewable Resources Coalition, Inc. and Renewable Resources Foundation, Inc. shall be exempt from commission in an amount up to $1,000.00 per donor.

5. Renewable Resources Coalition, Inc. and Renewable Resources Foundation, Inc. has previously applied for, or is preparing to apply for, a number of grants (listed in attached Exhibit B). All monies received by either Renewable Resources Coalition, Inc and Renewable Resources Foundation, Inc. from the grants listed in Exhibit B shall be exempt from commissions.

6. A commission shall be only paid on grant money specifically solicited or applied for at the direction of Contractor, if allowed by law and the conditions of such grants.

7. In an effort to avoid paying Contractor a commission more than once for a particular contribution, if a discrete Client receives a contribution for which commissions have been received by Contractor and then said Client decides to transfer that contribution to another discrete Client, than that transfer shall not be considered a commissionable contribution, such that Contractor shall not be paid a commission twice.

8. Final versions of Exhibits A and B shall be provided to Contractor by Client no later than April 9, 2008.

*see signature page attached*



Agreed and Accepted, and executed by the Parties:

**RENEWABLE RESOURCES COALITION**

By: _____

Name: _____
A Board Authorized Signatory

Date: 4-4-08

**RENEWABLE RESOURCES FOUNDATION**

By: _____

Name: ARTHUR HACKNEY
A Board Authorized Signatory

Date: 4-4-08

**ALASKANS FOR CLEAN WATER**

By: _____
Art Hackney
A Board Authorized Signatory

Date: April 4, 2008

**FUND RAISING, INC.**

By: _____
Robert Kaplan

Its: President

Date: 4 April/07

For Addendum date April 1, 2008 between
Contractor & client.

# EXHIBIT 2

1   BROWNSTEIN THOMAS, LLP
    MARK C. THOMAS SBN: 215580
2   180 Montgomery Street, Suite 940
    San Francisco, CA 94104
3   Telephone: 415-986-1338
    Facsimile: 415-986-1231
4
    Attorneys for Complainant
5   Fund Raising, Inc.

6

7

8                                   IN ARBITRATION

9

10   FUND RAISING, INC, a California            JAMS REFERENCE NO.: 1100056185
     Corporation,
11
                 Complainant,
12
          vs.                                   **FUND RAISING, INC'S FIRST AMENDED
13                                              DEMAND FOR ARBITRATION**

14   ALASKANS FOR CLEAN WATER, INC.,
     RENEWABLE RESOURCES COALITION,
15   INC., RENEWABLE RESOURCES
     FOUNDATION, HACKNEY &
16   HACKNEY, INC., AURTHUR HACKNEY,
     an individual, ROBERT GILLAM, an
17   individual and Does 1 - 44

18
                 Respondents.
19

20        Complainant Fund Raising, Inc. hereby alleges and complains as follows:

21                                     **PARTIES**

22        1.      Complainant Fund Raising, Inc. (hereinafter "FRI") is a corporation

23   organized and existing under California law.

24        2.      Respondent Alaskans For Clean Water, Inc. (hereinafter "AFCW") is a

25   corporation organized and existing under Alaskan law.

26        3.      Respondent Renewable Resources Coalition, Inc. (hereinafter "RRC") is a

27   corporation organized and existing under Alaskan law.

28

4.      Respondent Renewable Resources Foundation (hereinafter "RRF") is a corporation organized and existing under Alaskan law.

5.      Respondent Hackney & Hackney, Inc. (hereinafter Hackney & Hackney") is a corporation organized and existing under Alaskan law.

6.      Respondent Art Hackney (hereinafter "Hackney") is an individual over the age of eighteen (18).

7.      Respondent Robert Gillam (hereinafter "Gillam") is an individual over the age of eighteen (18). FRI is informed, believes and thereon alleges that Robert Gillam is the alter ego of Respondents AFCW, RRC, and RRF.

8.      Respondents ACFW, RRC, RRF, Hackney & Hackney, Hackney, and Gillam are collectively referred to as "Respondents."

9.      FRI is informed, believes and thereon alleges that, at all material times ACFW, RRC and RRF were completely dominated by Gillam and each were the alter ego of ACFW, RRC and RRF. ACFW, RRC and RRF were corporate shells of Gillam, and nothing more, and Gillam effectively controlled the day to day operations of ACFW, RRC and RRF.

10.     There exists, and at all times herein mentioned has existed, a unity of interest and ownership between Gillam, on the one hand, and ACFW, RRC and RRF, on the other, such that any individuality and separateness between the parties has ceased. FRI is informed and believes, and thereon alleges that: (1) Gillam has completely controlled, dominated, managed and operated AFCW, RRC, and RRF for his sole and exclusive benefit; (2) Gillam commingled his assets with the corporations to suit his needs and convenience; and (3) Gillam has failed to maintain any degree of separateness with ACFW, RRC and RRF, and failed to observe corporate formalities.

11.     FRI believes and thereon alleges that Gillam has committed additional acts and omissions sufficient to impose alter ego liability of which FRI is presently unaware. Additional acts and omissions on the part of Gillam, consistent with those factors listed in *Associated Vendors, Inc. v. Oakland Meat Co* , (1962) 210 Cal.App.2d 825, 838-840, and subsequent cases, will be developed during discovery in this litigation.

COMPLAINANT'S FIRST AMENDED DEMAND FOR ARBITRATION - 2

12.     Adherence to the fiction of the separate existence of ACFW, RRC and RRF as entities distinct from Gillam would permit an abuse of the corporate privilege, sanction fraud and promote injustice.  ACFW, RRC and RRF have insufficient assets to respond to the an award of compensatory damages, costs, attorneys' fees and punitive damages sought in this case.

13.     Complainant is ignorant of the true names and capacities of Respondents sued herein as DOES 1-50 and therefore sue these Respondents by such fictitious names. Complainant will amend this Complaint to allege their true names and capacities when ascertained.  Complainant is informed and believes, and thereon alleges that each of these fictitiously named Respondents is in some manner responsible for the occurrences herein alleged and that Complainant's injuries as herein alleged were proximately caused by the aforementioned Respondents.

14.     Complainant is informed and believes, and thereon alleges that at all relevant times each of the Respondents was the agent, employee, partner, joint venturer, of each of the remaining Respondents, and in doing the things hereinafter alleged they were acting within the course and scope of such agency, employment, partnership, and joint venture, and, they authorized, ratified, aided, abetted, encouraged, and counseled the doing of the things hereinafter alleged.

## JURISDICTION, FORUM, AND LAW

15.     JAMS has jurisdiction over this matter pursuant to a written agreement to arbitrate this dispute.  All parties named in this complaint are either parties to the arbitration agreement or are the alter egos of parties to the agreement.

16.     The written agreement to arbitrate contains a forum selection clause, which specifies Los Angeles, California as the proper forum.

17.     The written agreement to arbitrate mandates that California law governs this dispute.

## GENERAL ALLEGATIONS

18.     Pebble Mine is the common name of a mineral exploration project investigating large copper, gold, and molybdenum deposits in the Bristol Bay region of

1   Southwest Alaska. Bristol Bay is also home to some of the largest runs of salmon in the world,

2   and the world's largest sockeye salmon fishery. It's also a popular sport fishing area, with lodges

3   catering to fishermen fishing for salmon and trophy-size trout. Respondents AFCW, RRC and

4   RRF claim that the Pebble Mine poses a significant and unacceptable risk to downstream fish

5   stocks. Respondent Gillam owns a large parcel of land near the proposed site of the Pebble

6   Mine, and has a private resort compound, The Lodge at Gillam's Pointe, on the parcel.

7         19.     In or around March of 2009, Respondents contacted FRI to assist them in

8   raising money to support a wide range of projects over a five year period opposing the Pebble

9   Mine Project in Alaska. Respondents represented to FRI that they needed to raise money

10   immediately to support what later became known as Ballot Measure 4, a ballot measure, which if

11   passed, would raise Alaska's environmental standards and overall regulatory framework for hard

12   rock mining. The need was immediate because Ballot Measure 4 was on the August 2008

13   Alaska primary ballot. Respondents also represented the need for a five year effort for funding

14   to oppose the Pebble Mine through education of the public and future ballot measures.

15         20.     In response, on or around March 20, 2009, FRI sent Respondents a

16   proposal, which outlined the services it would perform, and also included the biography of its

17   principal and a client list. After reviewing the proposal, Respondents instructed FRI to draft a

18   contract.

19         21.     On or around March 30, 2008, FRI sent Respondents a draft of the

20   proposed contract. Respondents, their retained counsel and Gillam were actively engaged in the

21   negotiation of the proposed contract. Respondents successfully negotiated changes to a number

22   of terms in the contract as well as the drafting of a separate addendum. The contract and

23   addendum were agreed to by all parties. A true and correct copy of the contract and addendum is

24   attached hereto as Exhibit A and incorporated herein (hereinafter referred to as "Contract").

25         22.     Pursuant to Section 1.01, the Contract commenced on April 1, 2008 and

26   continued for five years.

27         23.     Pursuant to Section 2.01 of the Contract, FRI was retained "to perform

28   general fundraising consulting services for [Respondents], which may, but are not required to,

1  include, without limitation, advising or working with [Respondents] to develop fundraising
2  strategy, messages and themes, drafting fundraising letters, soliciting potential contributors, and
3  organizing and training fundraising committees and individuals to solicit funds on behalf of
4  [Respondents], and consulting with [Respondents] with respect to its activities. [FRI] explicitly
5  makes no representations, promises, guarantees or warranties relating to how much money will
6  be raised or success or outcome for [Respondents]."

7      24.    As compensation for its services, Respondents agreed to pay FRI a base
8  compensation of one hundred twenty thousand dollars ($120,000.00) annually. (Section 3.01).
9  In addition to the base compensation, FRI was also to earn commissions on contributions
10  received by Respondents. (Section 3.02). From April 1, 2008 through September 15, 2008 FRI
11  was to receive a fifteen percent (15%) commission on any and all aggregate contributions
12  received directly or indirectly by Respondents up to two million five-hundred thousand dollars
13  ($2,500,000.00), and a twenty percent (20%) commission on any and all aggregate contributions
14  received directly or indirectly by Respondents, without limitation, in excess of two million five-
15  hundred thousand dollars ($2,500,000.00).

16      25.    After September 15, 2008, in addition to the base compensation, FRI was
17  to earn a fifteen percent (15%) commission of any and all aggregate contributions on any and all
18  aggregate contributions received directly or indirectly by Respondents up to five million dollars
19  ($5,000,000.00), and a twenty percent (20%) commission of any and all aggregate contributions
20  received directly or indirectly by Respondents, without limitation, in excess of five million
21  dollars ($5,000,000.00) during each twelve month period.

22      26.    Upon execution of the Contract, FRI immediately began to perform its
23  duties as outlined in the Contract. For example, FRI drafted fund raising letters; solicited
24  potential contributors; attempted to organize and train fundraising committees and individuals to
25  solicit funds; consulted with Respondents regarding fund raising activities; interviewed
26  leadership to ascertain opportunities and assign tasks; attempted to purchase lists for direct mail;
27  solicited proposals/information for internet campaign; solicited various individuals and groups;
28  organized brochure used as "outsert" for two magazines; designed fundraising program for lodge

1  owners; analyzed, evaluated and attempted to expanded resources; wrote selected fundraising

2  letters; solicited selected potential contributors; attempted to work with leadership to develop and

3  prioritize prospect lists; developed fundraising strategy and goals; oversaw all fundraising

4  activities; and successfully solicited campaign contributions.

5         27.    Respondents, however, refused to cooperate with FRI's efforts to raise

6  funds.  For example, Respondents failed to provide funding for purchase of lists for email and

7  mail campaign; failed to provide funding for internet campaign; failed to timely respond to

8  communications; failed to provide support staff; failed to make telephone calls or send letters;

9  and failed to provide access to their leadership.

10         28.    On or around September 18, 2009, Respondents sent FRI an e-mail, which

11  stated in relevant part: "RRC and RRF have decided to exercise their six month option to cancel

12  the fundraising agreement with your company.  Accordingly, we will consider the effective date

13  of the termination to be October 4, 2008 which is the six month anniversary of the agreement

14  executed by Art Hackney."  Respondents, however, did not have a six month option to cancel the

15  Contract.

16         29.    Section 1.02 limited Respondents' right to cancel the Contract.

17  Respondents did not have the contractual right to terminate the Contract until March 31, 2009.

18  After March 31, 2009 Respondents could only terminate the Contract for cause.  In order to

19  terminate the Contract for cause, Respondents were required to give FRI at least sixty (60) days

20  written notice prior to the effective date of the termination.  To be effective, the written

21  termination notice must set forth the specific reasons why FRI was not fulfilling its duties under

22  the Contract, and outline specific steps to correct any problems.  Respondents would only be able

23  to terminate the Contract is FRI was unable to cure the default within the sixty day (60) notice

24  period.

25         30.    Respondents did not have cause to terminate the Contract.  Moreover,

26  Respondents did not satisfy all conditions required for Respondents to invoke their right to

27  terminate the Contract for cause. (Section 1.02).  Specifically, Respondents did not provide FRI

28  with sixty (60) days written notice of the specific reasons FRI was not fulfilling its duties, and

outline the specific steps needed to correct any problems.  Furthermore, Respondents did not provide complete cooperation in FRI's efforts to perform and did not give FRI sixty (60) days to cure any alleged default prior to terminating the Contract.

31.    Respondents did not have the right to terminate the Contract without cause.  Respondents could only terminate the Contract without cause if Respondents "deems by a majority vote of said Client's Board of Directors to wind-down and formally dissolve, following all federal, state and local laws relating to such a wind-down, fully satisfies its financial and contractual obligations for payment to Contractor, and such Party does formally and legally dissolve, so long as all obligations to Contractor are satisfied, and such Client does not reconstitute itself with substantially the same purpose, staff and donors in another form or fashion to fulfill the same or similar role as said Client as a means and/or method to all, or in part, avoid its obligations to Contractor, then said Client may be able to terminate this Agreement without Cause upon sixty days (60) notice to Contractor." (Section 1.02).  These circumstances, which would allow Respondents to terminate the Contract without cause, did not occur.

32.    To date, FRI has not been paid the full amount of base compensation and commissions owed under the Contract.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

33.    FRI incorporates herein each of the foregoing paragraphs as though fully set forth herein.

34.    FRI has performed all conditions, covenants and promises required on its behalf to be performed in accordance with the terms and conditions of the Contract, except as prevented by the acts or omissions of Respondents or as excused by Respondents' breach thereof.

35.    Respondents breached the Contract by, among other ways, failing to cooperate with FRI in fund raising efforts, terminating the Contract before the one year.

1  Terminating the Contract without cause; failing to pay the base compensation owed under the

2  Contract, and failing to pay commissions owed under the Contract.

3        36.    As a direct and proximate cause of Respondents' breaches of the

4  Agreement, FRI has been damaged in an amount according to proof.

5        WHEREFORE, FRI prays for relief as set forth below.

6  <center>**SECOND CAUSE OF ACTION**</center>

7  <center>**FRAUD**</center>

8        37.    FRI incorporates herein each of the foregoing paragraphs as though fully

9  set forth herein

10        38.    In or around March and April 2008, Respondents made numerous

11  representations concerning their desire to retain FRI. Specifically, Art Hackney, an authorized

12  agent for Respondents, represented that (1) Respondents intended to comply with the terms of

13  the Contract; (2) FRI would have all the resources necessary to lead a successful fundraising

14  campaign; and (3) FRI would receive the cooperation necessary to lead a successful fundraising

15  campaign.

16        39.    The representations made by Respondents were false. The true facts are

17  Respondents never intended to comply with the Contract. Respondents never intended to

18  provide the cooperation to FRI to raise funds. Respondents never intended to comply with the

19  five year contract term. Respondents never intended to provide FRI with the resources necessary

20  to lead a successful fundraising campaign.

21        40.    When Respondents made these representations, Respondents knew them

22  to be false and made these representations with the intention to deceive and defraud FRI, and to

23  induce FRI to act in reliance on these representations in the manner hereafter alleged, or with the

24  expectation FRI would so act.

25        41.    At the time Respondents fraudulent representations were made by

26  Respondents, FRI was ignorant of the falsity of Respondents' representations and believed them

27  to be true. In reliance on these representations, FRI was induced to and did enter into a contract

28

1  with Respondents, commenced work for Respondents, and forewent numerous other business

2  opportunities.  Had FRI known the actual facts, FRI would not have taken such action.

3          42.    FRI's reliance on Respondents' representations was justified.

4          43.    As a proximate result of the fraudulent conduct of Respondents as herein

5  alleged, FRI was damaged in an amount to be proved at trial.

6          44.    The aforementioned conduct of Respondents was an intentional

7  misrepresentation, deceit, or concealment of a material fact known to the Respondents with the

8  intention on the part of the Respondents of depriving Complainant of legal rights and causing

9  injury, and was despicable conduct that subjected FRI to an unjust hardship in conscious

10  disregard of FRI's rights, so as to justify an award of exemplary and punitive damages.

11          WHEREFORE, FRI prays for relief as set forth below.

12                          **THIRD CAUSE OF ACTION**

13                      **NEGLIGENT MISREPRESENTATION**

14          45.    FRI incorporates herein each of the foregoing paragraphs as though fully

15  set forth herein

16          46.    In or around March and April 2008, Art Hackney, an authorized agent of

17  Respondents, made numerous representations regarding Respondents' interest in retaining FRI.

18  Specifically, Respondents represented that (1) Respondents intended to comply with the terms of

19  the Contract; (2) FRI would have all the resources necessary to lead a successful fundraising

20  campaign; and (3) FRI would receive the cooperation necessary to lead a successful fundraising

21  campaign.

22          47.    The representations made by Respondents were false.  The true facts are

23  the Respondent declined to provide the promised cooperation, personnel, and resources required

24  under the Contract.

25          48.    When Respondents made these representations, Respondents had no

26  reasonable ground for believing them to be true.

27

28

49.     Respondents made these representations with the intention of inducing FRI to act in reliance on these representations in the manner hereafter alleged, or with the expectation the FRI would so act.

50.     At the time Respondents' negligent misrepresentations were made by Respondents, FRI was ignorant of the falsity of Respondents' representations and believed them to be true.  In reliance on these misrepresentations, FRI was induced to and did enter into a contract with Respondents, commenced work for Respondents, and forewent numerous other business opportunities.  Had FRI known the actual facts, FRI would not have taken such action.

51.     FRI's reliance on Respondents' representations was justified.

52.     As a proximate result of the fraudulent conduct of Respondents as herein alleged, FRI was damaged in an amount to be proved at trial.

WHEREFORE, FRI prays for relief as set forth below.

///

## **PRAYER FOR RELIEF**

WHEREFORE, Complainant respectfully prays for relief as follows:

1.     For compensatory damages in amounts to be determined at trial;

2.     For punitive damages in amounts to be determined at trial;

3.     For pre-judgment interest as authorized by the Contract and to the extent permitted by law;

4.     For an accounting of sums owed to Complainant;

5.     For an award of attorneys' fees, costs and expenses incurred in the prosecution of this action, as authorized under the terms of the Contract;

6.     For an award doubling the amount awarded by the Arbitrator if the award is not paid within thirty (30) days after the award is made; and

7.     For such other and further relief as the Arbitrator may deem proper.

///

///

///

1

2   DATED: May 19, 2009

3

4

5

BROWNSTEIN THOMAS, LLP

MARK C. THOMAS
Attorney for Complainant
Fund Raising, Inc.

# EXHIBIT A

## CONSULTING AGREEMENT

This Consulting Agreement (hereinafter "Agreement") is made and entered into between **Fund Raising, Inc.**, a California Corporation, located at 12021 Wilshire Blvd., #542, Los Angeles, California 90025 (hereinafter "Contractor"), and **Art Hackney, Hackney & Hackney, Inc. (Alaska Entity #88598D), Alaskans For Clean Water, Inc. (Alaska Entity #114856); Renewable Resources Coalition, Inc. (Alaska Entity #95608); and Renewable Resources Foundation, Inc. (Alaska Entity #99660)**, and/or any and all successor or related entities, currently located at the offices of Hackney & Hackney, Inc., 1503 W. 31st Avenue, Anchorage, Alaska 99503, (hereinafter all collectively referred to as "Client"). Contractor and Client are sometimes collectively referred to hereafter as the "Parties" or individually as "Party."

### RECITALS

A.     Client desires to raise money for various election, public education, lobbying or other efforts in opposition to the "Pebble Mine" project in Alaska;

B.     Client desires to engage Contractor to perform general fundraising and related consulting services for Client effort in opposition to the "Pebble Mine" project in Alaska;

C.     Accordingly, Client and Contractor desire to enter into this Agreement to evidence the engagement of Contractor by Client;

NOW, THEREFORE, in consideration of the promises and other consideration stated herein, the Parties hereto agree as follows:

### ARTICLE 1
### TERM OF CONTRACT

**Section 1.01 - Term.** This Agreement shall be effective as of April 1, 2008 and shall continue in effect for a period not to exceed five years from execution date of Agreement (the "Term"). Notwithstanding anything to the contrary contained herein, the Term of this Agreement may be terminated by Client pursuant to Section 1.02 below.

**Section 1.02 - Termination.** At any time after one year from the commencement of the Term, Client shall have the right to terminate this Agreement only for cause by giving Contractor at least sixty (60) days written notice (the "Termination for Cause Notice") prior to the effective date of such termination. For purposes hereof, "for cause" shall mean Contractor's failure to perform a majority of its duties as provided elsewhere in this Agreement after Client has notified Contractor in writing of the specific reasons Contractor is not fulfilling its duties hereunder, outlines in writing specific steps to correct any such problems, provides complete cooperation to Contractor in its efforts to perform, and contractor has failed to cure such default within sixty (60) days after receipt of such written notice. Client recognizes that by entering into this Agreement, Contractor is foregoing the opportunity to solicit and accept other business, and that nature of Contractor's business would make it difficult for the Contractor to acquire other business if this Agreement is terminated. If Client does elect to terminate Contractor for cause, as defined herein, then Client agrees to pay Contractor all remaining expenses and Continuing Base Compensation, as defined in Section 3.01, due and specifically payable on the effective date of termination. All other payments due pursuant to Article 3, Compensation, are due and specifically payable on the effective date of Termination or when such contribution is received by Client. Such payments shall include, but are not limited to, all Contractors' Continuing Base Compensation, Commissions, and expense reimbursements accrued or incurred in connection with work in progress. Client agrees to pay Contractor commissions on all contributions solicited by Contractor, or caused to be solicited by Contractor directly or indirectly when received by Client, even if the Client receives such contributions after the effective date of any termination or after the expiration of the Term hereof for a period of twelve months. Notwithstanding anything to the contrary contained herein, in the event any

discrete Client which is a Party to this Agreement deems by a majority vote of said Client's Board of
Directors to wind-down and formally dissolve, following all federal, state and local laws relating to such a
wind-down, fully satisfies its financial and contractual obligations for payment to Contractor, and such
Party does formally and legally dissolve, so long as all obligations to Contractor are satisfied, and such
Client does not reconstitute itself with substantially the same purpose, staff and donors in another form or
fashion to fulfill the same or similar role as said Client as a means and/or method to all, or in part, avoid
its obligations to Contractor, then said Client may be able to terminate this Agreement without Cause
upon sixty days (60) notice to Contractor.

## ARTICLE 2
### SERVICES TO BE PERFORMED BY CONTRACTOR

**Section 2.01 - Duties.** Client hereby agrees and retains the services of Contractor to perform
general fundraising consulting services for Client, which may, but are not required to, include, without
limitation, advising or working with Client to develop fundraising strategy, messages and themes,
drafting fundraising letters, soliciting potential contributors, and organizing and training fundraising
committees and individuals to solicit funds on behalf of Client, and consulting with Client with respect to
its activities. Contractor explicitly makes no representations, promises, guarantees or warranties relating
to how much money will be raised or success or outcome for Client.

      A.    Contractor shall not be responsible for the day-to-day implementation of
the fundraising plan and/or activities  Essential to this Agreement and its execution is Client's agreement
to make available to Contractor one or more staff persons to implement the day-to-day fundraising plan,
as instructed by Contractor. Contractor expects that activities of Client staff so assigned will include, but
not be limited to, following direction of Contractor in the implementation of the fundraising plan,
soliciting support and contributions of targeted individuals and groups, soliciting participation of
prospective donors or contributors with Finance Committees, following up with prospective donors or
contributors, organizing and managing fundraising events, researching prospective donors, soliciting
prospective donors, working with Finance Chair and Finance Committees, producing call lists, and other
activities as may be necessary to successfully implement the fundraising plan.

**Section 2.02 -** Method of Performance. Contractor will, in its sole discretion, determine the
method, details, and means of performing the above described services subject to the advice and consent
of the Client and the provisions of this Agreement.

**Section 2.03 –** Additional Staff. Contractor may use its own staff to perform the services required
under this Agreement; such staff shall work under the supervision of Contractor.

**Section 2.04 -** Independent Contractor. Contractor shall perform the services under this
Agreement as an independent contractor and Client agrees Contractor shall not be treated as an employee
of Client for federal, state, or local tax purposes, or any other purposes.

**Section 2.05 -** Exclusive Services  During the Term of this Agreement, Client shall not retain the
services of any other fundraiser for compensation, directly or indirectly, without the prior written consent
of Contractor. Any other fundraisers hired or otherwise engaged for the benefit of Client shall work
under the direction of Contractor, unless otherwise agreed to in writing by Contractor. Any fees,
commissions or other payments paid to such persons will be in addition to the Base Compensation and
Commissions due Contractor under the terms of this Agreement.

      a.  Notwithstanding anything to the contrary contained herein, Contractor is aware that
an agreement exists between Client and Bill Cromer individually for him to perform very specific, limited
and targeted fundraising, to be performed by him personally and not by his agents, assigns or employees,
said activities further addressed in Section 3.01 (3) and in Exhibit A, incorporated herein by this
reference.

**Section 2.06 - <u>Contractor Acting as Agent for the Procurement of Goods or Services</u>.** It is agreed and understood by Client that Contractor may act as the agent of Client in connection with the procurement or purchase of vendors' goods or services benefiting the Client. The term "vendor" is defined to mean any person or entity providing goods or services for compensation and for the benefit of the Client, other than Contractor. In the event such goods or services are procured or purchased by Contractor, vendor invoices shall be submitted by Contractor directly to Client for a direct payment by Client to the vendor. Notwithstanding the fact that Contractor has no duty to pay for vendor goods or services, if Contractor does so to protect its credit or for any other reason, Client agrees to indemnify Contractor and hold Contractor harmless, through reimbursement or otherwise, from any amounts Contractor becomes obligated to pay or elects to pay in connection with vendor goods or services. Contractor shall not incur any individual expense greater than $2,500 without prior knowledge of Client until such time as there is exists an agreed upon budget for all expenses.

## ARTICLE 3
## COMPENSATION

**Section 3.01 - <u>Base Compensation and Continuing Base Compensation</u>.** In consideration for services to be performed by Contractor, Client agrees to pay Contractor non-refundable base compensation ("Base Compensation") of Sixty-Eight Thousand Seven-Hundred Fifty ($68,750), deemed fully earned and payable upon execution of this Agreement, for the period of April 1, 2008 through August 31, 2008. Notwithstanding anything to the contrary contained herein, Contractor agrees to allow Client to pay Base Compensation as follows: $30,000 upon execution of Agreement; $30,000 on May 15, 2008; and $8,750 on July 1, 2008. For the period after September 15, 2008 through the termination of Contractors services, Base Compensation shall become ("Continuing Base Compensation") of One-Hundred Twenty-Thousand Dollars ($120,000) per every 12 month period, starting September 1, 2008. Such Continuing Base Compensation during this period shall be paid in monthly installments of Ten-Thousand Dollars ($10,000), due and payable on the first day of each month. In the event of early termination for cause as described in Paragraph 1.02, Continuing Base Compensation shall be paid on a pro-rata basis. All Base Compensation and Continuing Base Compensation shall be paid without deduction for social security, federal or state taxes, or any other charges, offsets or deductions

**Section 3.02 - <u>Commissions</u>.**

    1.    In addition to the Base Compensation payable pursuant to Section 3.01, the Client agrees to also pay Contractor commissions on the following schedule during the period April 1, 2008 through September 15, 2008:

        a    Fifteen Percent (15 %) of any and all aggregate contributions, as defined herein in Section 3.02, received directly or indirectly by Client up to Two Million Five-Hundred Thousand Dollars ($2,500,000).

        b.    Twenty percent (20%) of any and all aggregate contributions, as defined herein in Section 3.02, received directly or indirectly by Client, without limitation, in excess of Two Million Five-Hundred Thousand Dollars ($2,500,000).

    2.    In addition to the Continuing Base Compensation payable pursuant to Section 3.01, Client agrees to also pay Contractor commissions on the following schedule during the period after September 15, 2008:

        a.    Fifteen Percent (15%) of any and all aggregate contributions, as defined in Section 3.02, received directly or indirectly by Client up to Five Million Dollars ($5,000,000) during each twelve month period, starting September 15, 2008.

        b.    Twenty percent (20%) of any and all aggregate contributions, as defined in Section 3.02, received directly or indirectly by Client, without limitation, in excess of Five Million Dollars ($5,000,000) for any twelve month period starting after September 15, 2008.

    3.    Notwithstanding anything to the contrary contained herein, contributions received by Client directly and personally from Robert Gillam or the Moore Foundation shall remain excluded from commissions. On a one-time basis only, all contributions received from the May 4th Trout Unlimited event in New York City shall also be excluded from commissions. As discussed in Section 2.05 (a),

contributions limited to those personally solicited, collected and delivered to Client by Bill Cromer only, and limited to only those names listed on Attachment A, incorporated herein by this reference, shall be excluded from Contractor commissions for a period of forty five days (45) from execution of this Agreement ("Cromer Exclusionary Period"). At the end of the Cromer Exclusionary Period, all contributions from names and entities on Attachment A shall be deemed fully commissionable to Contractor.

4.      For the purposes of this Agreement, "Contributions" shall mean one hundred percent (100%) of the total amount of monetary and non-monetary contributions actually received by Client, either directly or indirectly, from any source, regardless of whether that contribution or pledge was solicited directly by Contractor, caused to be solicited by Contractor, or solicited by anyone else for any reason, from and after the effective date, even if such contributions are received by the Client after the termination or expiration of the Term hereof for a period of twelve months, regardless of termination or expiration. Additionally, for the purposes of this Agreement, "Contributions" shall mean, in addition to any monetary contribution made directly to Client, any contributions made by any person or entity to or that are; i) given directly to Client or any subsequent entity it becomes; ii) given to another entity, which makes a contribution to Client; iii) made as a payment by any person or entity to another entity or person to satisfy obligations of Client; iv) made as a payment by any person or entity to another entity or person to undertake any expenditures on behalf of Client or issue on which Client is based; or, v) made by any person or entity to aid or support Client. Contributions will be deemed received upon the date of receipt, regardless of when deposited by Client. All commissions due under this Agreement shall be calculated on a weekly basis, based on the date of receipt in the prior seven day period, according to the terms herein. Client agrees to pay Contractor commissions on Friday of each week for the prior seven day period.

Section 3.03– Expenses. Client agrees to reimburse Contractor within seven (7) days of submission of all expense reimbursement requests, when such requests become due and payable, for all amounts incurred by Contractor in connection with performance of its duties. Expenses include, but are not limited to, airfare, car rental, hotel, postage, printing, relevant wireless and land-line telephone, facsimile, copies, data entry and database creation. If any dispute arises as to any invoice for expense incurred by Contractor in connection with the performance of its duties under this Agreement, Client shall pay the undisputed amount according to terms described herein, and may withhold the disputed amount for a period not to exceed two weeks pending review and resolution with Contractor. After resolution of any disputed invoice for expenses, Client shall make immediate full payment of any or all remaining undisputed amount within three (3) days. Client agrees to pay Contractor an expense deposit of Two Thousand Five-Hundred Dollars ($2,500) at the start of the Term to be held by Contractor until the end of the Term, and used by Contractor as an off-set against any outstanding expenses and/or commissions due to Contractor at the end of the Term. Any remaining balances will be returned to Client. Contractor shall not incur any individual expense greater than Two-Thousand Five-Hundred Dollars ($2,500) without prior knowledge of Client.

Section 3.04 - Delinquent Payments. Client hereby agrees that if for any reason it does not pay any fees, commissions or other monies due to Contractor or does not reimburse Contractor for its expenses within five (5) days of when they become due, any delinquent amounts shall accrue interest at the lesser of the following rates: (I) ten percent (10%) interest per annum; or (ii) the maximum rate allowed by law, until such time as such amounts are paid or reimbursed in full.

Section 3.05 - Work Stoppage. If Client fails to make any payments due to Contractor pursuant to this Agreement when due, Contractor may, in its sole and absolute discretion, immediately cease performing its duties as stated in this Agreement. Additionally, if Client fails to make any payments due to Contractor pursuant to this Agreement when due, Contractor may instruct, upon two days written notice to Client, all of Contractor's employees or agents to cease performing any services which they are

performing directly or indirectly for Client unless such amounts are paid in full within this two day period. Contractor reserves the right to seek a temporary restraining order and/or preliminary injunction and/or other similar equitable relief in any court of competent jurisdiction for the purpose of freezing Client accounts in the event of non-payment, until such payment is made. This right to seek equitable relief is limited to the stated purpose, and all other disputes, proceedings and controversies shall be subject to the provisions of Section 6.05 below. Contractor and his employees and agents shall not be liable for any damages to Client, its affiliates, officers, directors, candidates, representatives, agents, employees or any other person, caused by the cessation of the work by Contractor, his agents or employees, pursuant to the terms of this Section 3.05. Client shall remain liable for all fees and commissions due hereunder, and any direct and indirect damages caused by Client in failing to fulfill its obligations hereunder. Client agrees that it shall not be allowed to terminate this Agreement if Contractor exercises its rights pursuant to this Section Additionally, Client agrees not to hire or otherwise engage the services of any other fundraiser during two day notice period or such work stoppage period.

Section 3.06 - Assurance of Performance. Client agrees that it will pay Contractor all fees, commissions and expenses when due. Client warrants that it will not use Contractor's fees and commissions to pay any expenses, fees, commissions of other consultants or employees of Client, or to purchase television, cable television or radio airtime, produce or pay for postage of mailers, or for any other purpose other than payment to Contractor Client agrees that any diversion of Contractor funds shall be considered a bad faith action.

## ARTICLE 4
## OBLIGATIONS OF CONTRACTOR

Section 4.01 - Confidentiality. Contractor shall, with respect to any information designated by Client or its member organizations as confidential, hold such information in confidence and use same only in connection with the services provided hereunder.

Section 4.02 - Liability. Client agrees that Contractor shall not be liable or held liable to Client, or to any party who may claim any right due to a relationship with Client, for any act or omission in the performance of Contractor's services under the Terms of this Agreement unless such act or omission is held by a Trier of fact to be due to the willful misconduct or gross negligence of Contractor. Client agrees to indemnify and hold Contractor harmless from any obligations, costs, claims, judgments, attorneys' fees, and attachments imposed on or incurred by Contractor arising from, growing out of or in any way relating to the services rendered to or on behalf of the Client under the terms of the Agreement. Such indemnification obligation by Client shall also include the costs incurred by Contractor to defend such action, as such costs are incurred. Client agrees that Contractor shall have no liability for any obligations, lawsuits, claims, actions or judgments imposed upon Client by any individual, entity or governmental entity.

Section 4.03 - Compliance with Laws. In its performance under this Agreement, Contractor shall make all reasonable efforts to comply with laws pertaining to Client contributions; provided, however, Client acknowledges that it has and shall have full responsibility and the duty to comply with all laws pertaining to reporting contributions and to file all documents required of it with all government and regulatory authorities. Additionally, Client agrees to make its attorney available to Contractor if Contractor has any questions regarding reporting or other requirements relating hereto. Client agrees that Contractor shall have no responsibility whatsoever for reporting any contributions on the behalf of Client.

## ARTICLE 5
## OBLIGATIONS OF CLIENT

Section 5.01 - Cooperation. Client agrees to cooperate fully with and be responsive to all reasonable requests of Contractor necessary to the performance of Contractor's duties under this Agreement. Client agrees to use its best and good faith efforts to make its principals and leadership

available to Contractor to perform and/or participate in the following activities and actions upon request of Contractor: (i) initiate fundraising related telephone calls and participate in fundraising activities as requested by Contractor; (ii) attend meetings and participate in fundraising, finance and other committee activities; (iii) participate in the timely review and execution of letters and other materials; (iv) review and approve fundraising plans; (v) solicit participation and help of Client leadership and the leadership of supporting organizations; (vi) provide Contractor with direct access to Client leadership; (vii) provide Contractor with appropriate budget to effectively executes its obligations under the Terms of this Agreement; and (viii) provide Contractor with timely information on Client's activities. Client shall also make available to Contractor its entire contact and related lists, and other materials and resources as may be needed to perform Contractor's duties.

Section 5.02 - <u>Confidentiality</u>. Client shall, with respect to terms of Article 3 of this Agreement, hold said terms in strict confidence. Client understands that its failure, or the failure of its leadership, employees, contractors and agents, to maintain confidentiality of compensation or commissions due Contractor under this Agreement may materially affect contributions to Client and Contractor's commissions. However, if Client is required to disclose Contractor's compensation to a potential donor as condition of receiving donor's contribution, only after receiving explicit written permission from Contractor, Client may disclose in confidence the terms of Article 3 only to the extent needed. If the Client is required to report Contractor's compensation and commissions to a government reporting agency, Client may disclose such information to a government agency only. Failure to maintain confidentiality, except as allowed by the preceding sentence, will be acknowledged by as a material breach of this Agreement and Client agrees to be held liable for any loss of commissions from contributions that would have been received by Client had the terms of Article 3 been held in confidence.

Section 5.03 - <u>Assignments</u>. Neither this Agreement nor any duties or obligations of Client under this Agreement may be assigned by Client without the prior written consent of Contractor.

Section 5.04- <u>Compliance with Laws</u>. Client warrants and covenants that it has and will fully comply with all laws pertaining to Client contribution reporting. Client agrees to indemnify and hold Contractor harmless from any liability with respect thereto as provided in this Agreement. Client shall provide copy of fund raising reports filed with government agencies to Contractor within fifteen (15) days after request therefore by Contractor.

Section 5.05 - <u>Indemnification</u>. Client agrees to indemnify and defend Contractor, its employees, officers, directors, shareholders and agents (hereinafter collectively "Contractor Indemnitees"), for all expenses, fines, damages, costs, penalties, liability and amounts incurred in judgments or settlements, including attorneys' fees, suffered by Contractor Indemnitees, or any of them, as a result of threatened, pending or completed investigations, enforcement actions, claims, demands or any and all lawsuits against Contractor Indemnitees or any of them by a third party or parties, arising out of the activities or services of Contractor Indemnitees to, or on the behalf of, Client, provided that Contractor Indemnitees have not been held by a Trier of fact to have engaged in willful misconduct or gross negligence which causes, in whole or in part, the amounts claimed for indemnification. Client agrees to advance, within seven (7) days of a written request by Contractor, such legal fees, retainers and costs, as incurred or as maybe required to retain legal counsel of Contractors choosing, to defend against any such actions or seek advice or counsel relative to any threatened actions. Client also agrees to indemnify and hold Contractor Indemnitees, and each of them, harmless from any and all liability arising from or related to any requirements imposed on Client by any Client reporting and practices laws, which arise from any act or omission, including the negligence of Client, its employees and/or agents, provided that Contractor Indemnitees have not been held by a Trier of fact to have engaged in willful misconduct or gross negligence by act or omission., or act which causes, in whole or in part, the amounts claimed for indemnification

# ARTICLE 6
## GENERAL PROVISIONS

**Section 6.01** - <u>Notices</u>. Any notices to be given hereunder by either party to the other may be effected by either party in writing via certified mail.

**Section 6.02** - <u>Assignment.</u>. Contractor has right and authority to assign this Agreement to another entity of its choosing, so long as Contractor's commitment to Agreement remains the same.

**Section 6.03** - <u>Entire Agreement</u>. This Agreement constitutes the final, complete, and exclusive statement of the terms of the Agreement between the Parties and supersedes all prior and contemporaneous understandings or agreements of the Parties. Contractor is entering into this Agreement based on the previous representations by Art Hackney and/or Hackney & Hackney, Inc. that Boards of Directors of Clients have authorized Art Hackney to enter into this Agreement on their behalf. No party has been induced to enter into this Agreement by, nor is any party relying on, any representation or warranty outside those expressly set forth in this Agreement.

**Section 6.04** - <u>No Oral Modification</u>. This Agreement may be supplemented, amended or modified only by the mutual written agreement of the Parties. No supplement, amendment, or modification of this Agreement shall be binding unless it is in a writing executed by both Parties.

**Section 6.05** - <u>Severability of Agreement</u>  If either a court or an arbitrator of competent jurisdiction holds any provision of this Agreement to be illegal, unenforceable, or invalid in whole or in part for any reason, the validity and enforceability of the remaining provisions, or portions of them, will not be affected

**Section 6.06** - <u>Arbitration</u>. Any dispute which arises in connection with this Agreement or any claim or claims referring or relating to its performance or breach, or any other claim or dispute between the Parties hereto, including, but not limited to, any controversy over any clause, provision, paragraph or word, shall be submitted by the Parties to the American Arbitration Association or JAMS in Los Angeles, California for binding arbitration in the City of Los Angeles, with the Parties' choice of law acknowledged and agreed to be the law of the State of California. Choice of American Arbitration Association or JAMS shall be at the sole and absolute discretion of Contractor. The Parties expressly agree that all of the discovery mechanisms provided by California law, including depositions and third party discovery, shall apply and be available to the parties. If the Party obligated to pay an award fails to pay said award within thirty (30) days of the award, the amount of the award shall be doubled, and this provision shall be part of the award itself. If any filing is made to avoid arbitration or an arbitration award, any award against the filing party shall be doubled. Judgment upon an award made in such binding arbitration may be entered and enforced in any court of competent jurisdiction. The prevailing party in any such arbitration or judicial proceeding shall be entitled to recover all costs and expenses incurred, including reasonable attorneys' fees, such amounts to be part of the award itself.

**Section 6.07** - <u>Attorneys' fees</u>. If any proceedings are initiated to enforce or interpret the provisions of this Agreement, or to resolve any other dispute or controversy between the Parties, including arbitration, the prevailing party will be entitled to reasonable attorneys' fees incurred in addition to costs, expenses and any other relief to which the party may be entitled. If a party hereto has an award entered against it in arbitration, and said party: (i) opposes a petition to confirm the award as a judgment; (ii) opposes enforcement of any judgment in a court of competent jurisdiction, including any sister state court; (iii) files any other form of litigation or proceeding intended to obstruct or interfere with the arbitration process provided by this Agreement; or (iv) undertakes any other step or action to prevent arbitration or prevent enforcement of an arbitration award or a judgment, then the prevailing party in any such proceedings shall also be entitled to its reasonable attorneys' fees, costs and expenses as well as any other relief to which it may be entitled.

**Section 6.08** - <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California.

**Section 6.09** - <u>Authorization to Sign</u>.  All Parties and the individual entity Clients hereby represent and warrant that the person(s) executing this Agreement are authorized to execute this Agreement and to obligate the respective Parties to perform the Agreement.

**Section 6.10** - <u>Interpretation of Agreement</u>.  Client acknowledges that the Agreement has been jointly drafted by the Parties and that they have reviewed and revised the Agreement, or have had the opportunity to revise the Agreement and review the Agreement with their attorneys; accordingly any ambiguity contained herein shall not be construed for or against any Party.

**Section 6.11** - <u>Gender.</u>  References to any gender in this Agreement shall include all other genders; references to the singular shall include the plural; and references to "person" shall include corporation, firm, partnership or other form of association; all as required by the context of this Agreement.

**Section 6.12** -- <u>Corporation</u>.  Client acknowledges that this Agreement is between Client and Contractor, a registered, valid and current California corporation in good standing.

Agreed and Accepted, and executed by the Parties to be effective April 1, 2008:

**RENEWABLE RESOURCES COALITION**

By: _____
Art Hackney
A Board Authorized Signatory

Date: __4/4/08__

**RENEWABLE RESOURCES FOUNDATION**

By: _____
Art Hackney
A Board Authorized Signatory

Date: __4-4-08__

**ALASKA CLEAN WATER**

By: _____
Art Hackney
A Board Authorized Signatory

Date: __4/1/08__

**FUND RAISING, INC.**

By: _____
Robert Kaplan

Its: President

Date: __3/31/08__

# ADDENDUM

This addendum relates to that certain Agreement dated April 1, 2008 between Contractor and Client is hereby amended according to the following terms:

1. Contributions received directly from Richard Jameson, Ashley Reed, Art Hackney, John Holman, Luki Akelkok, Jack Hobson or employees and board members of Client shall be exempt from commissions.

2. Contributions solicited directly by Robert Gillam shall be exempt from commissions.

3. Renewable Resources Coalition, Inc. and Renewable Resources Foundation, Inc. has previously compiled a membership list of prior donors (listed in attached Exhibit A). Donations from such members shall be exempt from commission in an amount equal to twice the amount of such donors' largest prior annual contribution.

4. Employees of Renewable Resources Coalition, Inc. and Renewable Resources Foundation, Inc. may continue to sign up new member donors. Any such member donor's contributions to Renewable Resources Coalition, Inc. and Renewable Resources Foundation, Inc. shall be exempt from commission in an amount up to $1,000.00 per donor.

5. Renewable Resources Coalition, Inc. and Renewable Resources Foundation, Inc. has previously applied for, or is preparing to apply for, a number of grants (listed in attached Exhibit B). All monies received by either Renewable Resources Coalition, Inc. and Renewable Resources Foundation, Inc. from the grants listed in Exhibit B shall be exempt from commissions

6. A commission shall be only paid on grant money specifically solicited or applied for at the direction of Contractor, if allowed by law and the conditions of such grants

7. In an effort to avoid paying Contractor a commission more than once for a particular contribution, if a discrete Client receives a contribution for which commissions have been received by Contractor and then said Client decides to transfer that contribution to another discrete Client, than that transfer shall not be considered a commissionable contribution, such that Contractor shall not be paid a commission twice.

8. Final versions of Exhibits A and B shall be provided to Contractor by Client no later than April 9, 2008.

see signature
page attached

Agreed and Accepted, and executed by the Parties:

**RENEWABLE RESOURCES COALITION**

By: _____

Name: _____
A Board Authorized Signatory

Date: _____

**ALASKANS FOR CLEAN WATER**

By: _____
Art Hackney
A Board Authorized Signatory

Date: _____

**FUND RAISING, INC.**

By: _____
Robert Kaplan

Its: President

Date: _____

**RENEWABLE RESOURCES FOUNDATION**

By: _____

Name: _____
A Board Authorized Signatory

Date: _____

For Addendum date April 1, 2008 between
Contractor & client.

# EXHIBIT 3

**Mark Thomas**

| | |
|---|---|
| **From:** | Alexander Joselyn [jalexander@jamsadr com] |
| **Sent:** | Wednesday, June 03, 2009 5 48 PM |
| **To:** | tkhuu@nielsenhaley.com; scusick@nielsenhaley.com; mjg@sfglaw com, mgluck@sflaw com, mark@brownsteinthomas.com |
| **Subject:** | Fund Raising Inc. vs. Alaskans for Clean Water, Inc , et al. - REF# 1210027538 |

Good afternoon Counsel:

After speaking with JAMS' General Counsel, I have been advised to proceed with the commencement of the above-referenced Arbitration against the following two respondents: Renewable Resources Coalition, Inc. and Alaskans for Clean Water, Inc.  A commencement letter, which will include a strike-list with Arbitrator names, will follow shortly.

Upon the appointment of the Arbitrator, the parties may petition the Arbitrator to add Respondents, as that issue is for the Arbitrator to decide.

Should you have any questions or concerns, I am happy to set up a conference call between you and Mr. Jay Welsh, our General Counsel.

Have a good evening.

**Joselyn Alexander**
Case Manager
JAMS, *The Resolution Experts*
1601 Cloverfield Blvd
Suite 370-South
Santa Monica, CA 90404
Email: jalexander@jamsadr.com
310.309 6205 (Direct Dial)
310 396.7576 (Facsimile)

"Be kinder than necessary, for everyone you meet is fighting some kind of battle "

6/8/2009